# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BOROUGH OF LANSDALE,                          :
BOROUGH OF BLAKELY                            :        CIVIL ACTION
BOROUGH OF CATAWISSA,                         :        NO. 02-8012
BOROUGH OF DUNCANNON,                         :
BOROUGH OF HATFIELD,                          :
BOROUGH OF KUTZTOWN,                          :
BOROUGH OF LEHIGHTON,                         :
BOROUGH OF MIFFLINBURG,                       :
BOROUGH OF OLYPHANT,                          :
BOROUGH OF QUAKERTOWN,                        :
BOROUGH OF SCHUYLKILL HAVEN,
BOROUGH OF ST. CLAIR,
BOROUGH OF WATSONTOWN,
BOROUGH OF WEATHERLY,
PENNSYLVANIA
     Plaintiffs,

    v.

PP&L, INC., PPL ELECTRIC UTILITIES CORP., PPL
ENERGY PLUS, L.L.C., and PPL GENERATION,
L.L.C.,
    Defendants.

## Memorandum and Order

YOHN, J.                                              September ___, 2007

Currently before the court is one claim for violation of the Sherman Act § 2 brought by

the Boroughs of Lansdale, Blakely, Catawissa, Duncannon, Hatfield, Kutztown, Lehighton,

Mifflinburg, Olyphant, Quakertown, Schuylkill Haven, St. Clair, Watsontown, and Weatherly,

Pennsylvania ("the Boroughs" or "plaintiffs") against PP&L, Inc., PPL Electric Utilities Corp.,

PPL Energy Plus, L.L.C., and PPL Generation, L.L.C. (collectively, "PPL" or "defendants") out

of many in the complaint that alleged various antitrust violations and breach of contracts.

Plaintiffs allege that PPL violated section two of the Sherman Act, 15 U.S.C. § 2, in two ways: (1) "they have monopolized the sale of electric power in the wholesale power market available to the Boroughs to increase the price of power therein to the Boroughs, resulting in increase in the cost of power to the Boroughs under their present Power Contracts with PPL," (Compl. ¶¶ 14-15) and (2) they created a "price squeeze" by requiring plaintiffs "to pay wholesale prices for electric power substantially higher than the retail prices the Defendants charge for comparable service to its commercial and industrial customers, based on the additional charge demanded of Plaintiffs by Defendants," (Compl. ¶¶ 14, 18).

On April 5, 2006, I granted summary judgment in favor of PPL on most of plaintiffs' claims, including both of plaintiffs' claims for violation of Sherman Act § 2. *See Borough of Lansdale v. PP&L, Inc.*, 426 F. Supp. 2d 264, 282-89 (E.D. Pa. 2006). Specifically, I held that plaintiffs' Sherman Act § 2 claims were barred by the filed rate doctrine, which "'bars antitrust suits based on rates that have been filed and approved by federal agencies,'" *id.* at 282 (quoting *Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 378 F.3d 303, 306 (3d Cir. 2004)) and "rates filed with state agencies," *Lansdale*, 426 F. Supp. 2d at 282. However, upon reconsideration, I determined that plaintiffs' price squeeze claim was not barred by the filed rate doctrine because although "PPL is subject to regulation by both [the Federal Energy Regulatory Commission ("FERC")] and [the Pennsylvania Public Utility Commission ("PUC")], because neither agency has 'jurisdiction over the complete rate structure complained of by plaintiffs, it is improper to accord antitrust immunity' to the price squeeze claim raised here." *Lansdale*, 2007 U.S. Dist. LEXIS 35867, at *30 (citing *Ellwood City v. Pa. Co.*, 462 F. Supp. 1343, 1350 (W.D. Pa. 1979)). My ruling on the motion for reconsideration left undisturbed the grant of summary judgment in

favor of PPL with respect to plaintiffs' other Sherman Act § 2 claim—that PPL monopolized sale of electric power in the wholesale power market—as such, that claim is not at issue. *Lansdale*, 2007 U.S. Dist. LEXIS 35867, at *29 n.7.[1]

However, because defendants had initially posited grounds other than the filed rate doctrine in support of their motion for summary judgment on plaintiffs' price squeeze claim, I gave the parties the opportunity to submit new briefs or provide references to those pages of their prior briefs that addressed such grounds.  Defendants argue that plaintiffs have not adduced evidence from which a reasonable jury could find in their favor on any of the necessary elements of the prima facie case of a price squeeze claim.  (Def. Supp'l Br. 4.)  Additionally, defendants argue that plaintiffs have failed to show any antitrust injury or damages from the alleged price squeeze.  (*Id.* at 11.)  Plaintiffs have responded pointing to evidence they contend provides sufficient evidence from which a jury could find in their favor on the elements of a price squeeze claim.  (Pl.'s Supp'l Br. 3-14.)  Now before me are the alternative grounds in support of

---

[1]Almost identical claims were brought by the Borough of Olyphant, as an individual plaintiff, in *Borough of Olyphant v. PP&L, Inc.*, 2004 U.S. Dist. LEXIS 8958 (E.D. Pa. May 14, 2004), *aff'd*, 153 F. App'x 80 (3d Cir. 2005).  In that case, I dismissed Olyphant's first Sherman Act § 2 claim—the monopolization of the wholesale power market—without prejudice to Olyphant's right to pursue that claim in the pending *Lansdale* action.  *Olyphant*, 2004 U.S. Dist. LEXIS 8958, at *35; *see also Lansdale*, 426 F. Supp. 2d at 269 n.1, 307 n. 38.  Olyphant did join in that action and thus is bound by the court's decision that the monopolization claim is barred by the filed rate doctrine.  However, in the *Olyphant* action, I addressed the merits of Olyphant's allegations of a price squeeze and found that Olyphant had failed to show there was a genuine issue of material fact with respect to two elements for a claim of a price squeeze—the existence of a price squeeze and that PPL had a monopoly on wholesale power.  *Olyphant*, 2004 U.S. Dist. LEXIS 8958, at **38-44.  Accordingly, I granted defendants' motion for summary judgment on Olyphant's price squeeze claim.  *Id.* at *44.  As such, Olyphant is barred by the principles of res judicata, or claim preclusion, from relitigating that claim presently.  *See Lansdale*, 426 F. Supp. 2d at 306-07 (finding that Olyphant is barred by the principles of res judicata from litigating the "virtually identical" Sherman Act § 2 price squeeze claim).

defendants' motion for summary judgment as to plaintiffs' price squeeze claim.  For the reasons

that follow, defendants' motion for summary judgment as to plaintiffs' price squeeze claim under

Sherman Act § 2 will be granted.


### II. Standard of Review

Either party to a lawsuit may file a motion for summary judgment, and the court will

grant it "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Facts that

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a

rational person could conclude that the position of the person with the burden of proof on the

disputed issue is correct."  *Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir.

1996) (citation omitted).  When a court evaluates a motion for summary judgment, "[t]he

evidence of the non-movant is to be believed," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986), and "all justifiable inferences are to be drawn in [the non-movant's] favor."  *Id.*

Additionally, "[s]ummary judgment may not be granted . . . if there is a disagreement over what

inferences can be reasonably drawn from the facts even if the facts are undisputed."  *Ideal Dairy*,

90 F.3d at 744 (citation omitted).  However, "an inference based upon a speculation or conjecture

does not create a material factual dispute sufficient to defeat entry of summary judgment."

*Robertson v. Allied Signal, Inc*., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but

rather that party must go beyond the pleadings and present "specific facts showing that there is a

genuine issue for trial." Fed. R. Civ. P. 56(e).  Similarly, the non-moving party cannot rely on

unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a

summary judgment motion.  *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989)

(citing *Celotex v. Catrett*, 477 U.S. 317, 325 (1986)).  Further, the non-moving party has the

burden of producing evidence to establish prima facie each element of his claim.  *Celotex*, 477

U.S. at 322-23.  The non-movant must show more than "[t]he mere existence of a scintilla of

evidence" for elements on which he bears the burden of production.  *Anderson*, 477 U.S. at 252.

Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (citations omitted). "Generally, the movant's

burden on a summary judgment motion in an antitrust case is no different than in any other case."

*InterVest Inc. v. Bloomberg*, *L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) (internal quotation omitted).


**III. Discussion[2]**

**A. Elements of a Price Squeeze Claim**

Section 2 of the Sherman Act prohibits the monopolization or attempted monopolization

of a trade either single-handedly or via a combination or conspiracy.  15 U.S.C. § 2.  There are

two main elements to a Sherman Act § 2 monopolization claim: "(1) the possession of monopoly

power in the relevant market, and (2) the willful acquisition or maintenance of that power as

distinguished from growth or development as a consequence of a superior product, business

---

[2]For the purposes of this opinion, the court will assume a familiarity with the facts underlying this case.  *See Lansdale,* 426 F. Supp. 2d at 269-74 (laying out the factual background behind the case).

acumen, or historical accident." *United States v. Grinnell,* 384 U.S. 563, 570-71 (1966);

*Borough of Lansdale v. Phila. Elec. Co.*, 692 F.2d 307, 311 (3d Cir. 1982).

It is generally accepted that a "price squeeze involves a defendant who as a monopolist

supplies the plaintiff at one level (e.g., wholesale), competes at another (e.g., retail), and seeks to

destroy the plaintiff by holding up the wholesale price to the plaintiff while depressing the retail

price to common customers." *Utilimax.com, Inc. v. PPL Energy Plus, LLC,* 273 F. Supp. 2d 573,

582 (E.D. Pa. 2003) (quoting *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 418

(1st Cir. 2000)); *see also Ellwood City, Grove City, New Wilmington, Wampum, and Zelienople,*

*Pa. v. F.E.R.C.,* 701 F.2d 266, 268 n.4 (3d Cir. 1983) ("'Price squeeze' is defined as a situation

in which a wholesale supplier also selling at the retail level charges discriminatorily high rates to

a wholesale customer to prevent competition by that customer at retail." (citation omitted));

*Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1176 (8th Cir. 1982) ("A price squeeze occurs

when a vertically integrated company which has monopoly power at the wholesale level but faces

competition at the retail level sets its wholesale rates so high that its wholesale customers will be

unable to compete with it in the retail market." (citing *United States v. Aluminum Co. of Am.*, 148

F.2d 416, 436-48 (2d Cir. 1945)).

However, "the mere existence of a price squeeze does not per se establish a violation of

the Sherman Act." *Juliano v. Sun Ref. & Mktg. Co.*, 1997 U.S. Dist. LEXIS 24140, *32 (E.D.

Pa. Feb. 28, 1997).  Price squeezes that a defendant intends, or "predatory price squeezes," must

be distinguished from those that are the consequences of administrative inconsistency, or

"innocent price squeezes," which do not violate the Sherman Act.  John E. Lopatka, *The Electric*

*Utility Price Squeeze as a Cause of Action,* 31 UCLA L. Rev. 563, 603 (1984).  As such, the

Third Circuit has explicitly required plaintiffs to show "that the defendants deliberately produced the effect, sufficient to provide a reasonable basis for the jury to conclude that the 'squeeze' was not the result of natural market forces such as supply and demand or legitimate competition." *Bonjorno v. Kaiser Aluminum & Chem. Corp*., 752 F.2d 802, 809 (3d Cir. 1984), *cert. denied*, 477 U.S. 908 (1986).  Accordingly, as this court explained in *Olyphant*, in order to succeed, the plaintiff had to show:

> (1) it could not profitably compete with PPL for [retail] customers because the difference between PPL's retail rate charged to the [retail] customers and its wholesale rate charged to the Borough was too small or non-existent (i.e. that there was, in fact, a price squeeze); (2) PPL had monopoly power at the wholesale level; and (3) PPL intended to create a price squeeze to eliminate the Borough as a competitor at the retail level.

2004 U.S. Dist. LEXIS 8958, at *37, *aff'd*, 153 F. App'x 80 (not precedential).  The same three requirements are applicable in the instant action[3] and will be addressed in turn.[4]

## B. Existence of a Price Squeeze

To reiterate, plaintiffs must provide evidence that they could not profitably compete with PPL for retail customers because the difference between PPL's retail rate and its wholesale rate charged to plaintiffs was too small or non-existent.  Plaintiffs provide the following evidence to support this element of the prima facie case.  Plaintiffs first point out that, under the Power

---

[3]I also note that in their supplemental briefs, both parties quoted these elements from *Olyphant* and addressed the evidence with respect to each element.

[4]As described above, I gave the parties the opportunity to submit new briefs or provide references to those pages of their prior brief that addressed such grounds.  Both parties elected to submit new briefs and, in some cases, incorporated by reference portions of their prior papers. As such, all arguments and evidence related to this issue should be addressed in these new submissions.  However, in most instances, for the sake of thoroughness, I will address any additional remaining arguments that were raised in the parties' original summary judgment papers.

Supply Agreements,[5] they had to pay increased rates in the fourth and fifth years—February 1,

2002 through January 31, 2004.[6]  Plaintiffs paid the increased rates because, in May and June of

2001 and 2002,[7] they were unable to locate any other wholesale suppliers that could offer lower

rates than PPL, even allowing for the successive five percent increases charged by PPL.  At the

same time, plaintiffs allege, PPL Energy Plus purchased wholesale power from its generating

units at a lower, fixed rate of $35/MWH.[8]  (*See* Pl. Stmt. Facts ¶¶ 11-13 (citing Pl. Ex. 6).)  PPL

Energy Plus then, in turn, sold energy to PPL Electric Utilities ("PPL EU") (Pl. Ex. 7; Def. Stmt.

Facts ¶ 12.)   PPL EU was the PPL subsidiary that sold power to both the Boroughs and to PPL's

customers under the "provider of last resort" ("POLR") rates.[9]  (Pl. Ex. 7; Def. Stmt. Facts ¶ 12.)

---

[5]PPL and each of the Boroughs entered into five year power supply agreements ("Power Supply Agreements"), which commenced on February 1, 1999 and ran through January 31, 2004. (Pl. Ex. 2, Tab B at 1-2.)  The Power Supply Agreements provided that the Boroughs would purchase from PPL their wholesale electricity requirements at set rates for the first three years of the agreements (February 1, 1999 through January 31, 2002).  (Pl. Ex. 2, Tab A at 8.)  For years four and five of the agreements (February 1, 2002 through January 31, 2004), the Boroughs were entitled to request a lower wholesale rate, which PPL was entitled to accept or decline.  (*Id.* at 9-10.)  If PPL declined the Boroughs' request for a lower rate, the Boroughs had the right to unilaterally terminate the contract.  (*Id.*)  In the same years, PPL had corresponding rights to request a higher wholesale rate, with the Boroughs having similar rights to accept or decline and terminate the contract.  (*Id.*)

[6]Plaintiffs assert that they were forced to accept the increased rates under the Power Supply Agreements because of PPL's anticompetitive conduct in the wholesale PJM market. The existence of a monopoly in the wholesale market will be discussed *infra* Part III.C.

[7]Prior to the contractual deadlines for requesting a price decrease on June 1, 2001 and 2002, or the deadline to accept or decline a price increase, on July 1, 2001 and 2002, the Boroughs tested the market by receiving bids from alternate power suppliers in order to inform their decisions.  (Pl. Ex. 2, Tab A at 10, 12-13.)

[8]"MWH" stands for megawatt-hour.  There are 1,000,000 watts in one megawatt.

[9]If consumers do not or cannot choose to purchase their generation service from an alternative electric generation supplier, a local utility is also required to provide electricity to

The Boroughs contend that they paid more for wholesale power than did PPL Energy

Utilities[10] and that the "differentials were too great for the [B]oroughs to be able to offer retail

prices competitive with those extended by PPL." (Pl. Supp'l Br. 6.)  Plaintiffs provide evidence

they contend shows that the residential retail rates charged by three of the Boroughs—Lansdale,

Lehighton and Watsontown—are almost consistently higher than PPL's. (*See* Pl. Ex. 26.)

Plaintiffs argue that the "comparisons are strong evidence that the high wholesale prices that PPL

forced the [B]oroughs to pay left them unable to compete with PPL for customers at the retail

level." (Pl. Supp'l Br. 6.)  Moreover, plaintiffs assert, "it stands to reason that if PPL EU is

obtaining electricity [at a lower price], the [B]oroughs would be hard pressed to match PPL's

already low POLR rates, and indeed they could not do so." (*Id.*)[11]  Plaintiffs have failed to

produce facts sufficient for a reasonable jury to find a price squeeze existed.

First, plaintiffs have not adequately demonstrated what the relevant wholesale and retail

prices were for the time period during which they allege a price squeeze occurred.  Plaintiffs do

not provide evidence of the wholesale price PPL actually charged in the years of the alleged price

---

them as the "provider of last resort" ("POLR") at a capped price established by the PUC.

[10]The Boroughs assert that PPL EU was able to purchase power at the rate of $35/MWH. (Pl. Supp'l Br. 6-7 (citing Pl. Ex. 7).)  However, I note that the evidence in the record shows that PPL Energy Plus purchased power at the rate of $35/MWH from its generating subsidiaries. (Pl. Ex. 6.)  Plaintiff's exhibit seven nowhere shows that PPL Energy Plus sold energy to PPL EU at the same rate of $35/MMH.

[11]The internal transfer price for energy of PPL and subsidiaries is not determinative of the existence of a price squeeze.  Plaintiffs must prove that, given the wholesale rates PPL charged the Boroughs, PPL sold retail power at such a low *retail* rate that the Boroughs could not match it and still make a profit.  However, under Third Circuit precedent, *see Bonjorno*, 752 F.2d at 810, defendant's internal transfer price may be relevant to showing intent to create a price squeeze, and will be discussed *infra* Part III.D.

squeeze, February 1, 2002 through January 31, 2004.  According to a market analysis performed

in 2001 and commissioned by plaintiffs prior to agreeing to PPL's rate increase requests, PPL's

prices for wholesale energy, including the five percent contract increases, would be

$43.20/MWH in 2002 (year four of the contract) and $45.70/MWH in 2003 (year five of the

contract).  (Pl. Ex. 23.)[12]  This market analysis was conducted on May 21, 2001, approximately

six months before the 2002 price increase and eighteen months before the 2003 price increase.

(*See* Pl. Ex. 23.)  Thus, plaintiffs have provided a prediction of the wholesale prices plaintiffs

would be charged if the contract-based increases went into effect, rather than the actual

wholesale prices charged.  Plaintiffs also supply a market analysis that was performed on May

20, 2002, prior to their agreeing to the increase in 2003 (year five of the contract).  (Pl. Ex. 5.)

This analysis found that the Boroughs, not including Kutztown, would have to pay an average of

$41.88/MWH in 2003 for wholesale power, unlike the analysis conducted a year earlier that

found that the Boroughs would have to pay $45.70/MWH in 2003.[13]  (*Compare* Pl. Ex. 5 *with* Pl.

Ex. 23.)  Thus, it is unclear what the Boroughs actually paid PPL for wholesale energy during the

relevant period.  Moreover, the fact alone that wholesale rates plaintiffs had to pay to PPL

increased while the retail rates PPL charged remained static, (*see* Pl. Stmt. Facts ¶ 11), is

insufficient for a finding of a price squeeze.

---

[12]Technically, this exhibit is a prediction of what plaintiffs would pay were the five
percent increases in the Power Supply Agreements to go into effect.  However, applying the
inference most favorable to the plaintiffs, I will assume that the predicted prices were the actual
wholesales prices charged by PPL to the Boroughs.

[13]Reviewing the facts in the light most favorable to the non-moving party, the higher
wholesale price of $45.70 will be used for reviewing the remainder of the summary judgment
motion.

In addition, plaintiffs have furnished scant evidence showing the prices PPL actually charged its retail customers. Plaintiffs provide a report comparing PPL's retail rates with the Boroughs' retail rates during the week of January 22-29, 2004, in the Boroughs of Lansdale, Watsontown, and Lehighton only. (Pl. Ex. 26.) This report compares the retail prices charged from 100 KWHs [14] up to 2,500 KWHs, and in some cases up to 5,500 KWHs and 15,000 KWHs. (*Id.*) PPL's retail price for 1 MWH[15] of power ranged from $150.90 to $57.63,[16] depending upon the use of the electrical power and the volume sold. (*Id.*)[17] This comparison of PPL's retail rates to the Boroughs' retail rates was performed between January 22-29, 2004. (*See* Pl. Ex. 26.) Though plaintiffs provide evidence of PPL's retail rates in effect as of the last week of the contract, there is no indication that these were the retail rates PPL charged throughout the 2002 and 2003. Thus, plaintiffs have not provided evidence of the wholesale and retail prices PPL charged during the entirety of the years in which they allege the price squeeze occurred—the last

---

[14]"KWH" stands for kilowatt-hour. There are 1,000 watts in one kilowatt.

[15]Plaintiffs' evidence showing PPL's retail prices lists numerous rate comparisons for various electrical uses, from "residential hot water" to "general" or "primary" service. (Pl. Ex. 26.) The rates also vary from by KWH increments. (*Id.*) However, the court must compare equivalent quantities when reviewing PPL's wholesale prices, which are listed in terms of MWHs, to PPL's retail prices, which are listed in terms of KWHs. 1000 KWH equals 1 MWH.

[16]This is equivalent to $.1509 for 1KWH and $.05763 for 1KWH. The lowest rate charged by PPL to retail customers is found in a table titled "Borough of Lansdale[,] Primary[,] Rate Comparison," and in an identical table for the Borough of Watsontown, which states that for 600,000 KWH, PPL charged $34,579.00, which is equivalent to $.05763 per 1KWH or $57.63 for 1MWH. (Pl. Ex. 26.) This is still greater than the $43.20 per 1MWH ($.0432 per 1KWH) in 2002 and $45.70 per 1MWH ($.04570 per 1KWH) in 2003 the Boroughs alleged they were charged by PPL for wholesale energy.

[17]Plaintiffs' exhibit 26 does not specifically state which rates are for industrial and commercial customers, although it does state that certain rates are for "residential" uses. Eliminating all rates explicitly labeled "residential," the highest rate charged is $139.10/MWH.

two years of the Power Supply Agreements.  Indeed, the evidence that was produced tends to show that PPL's wholesale rates to the Boroughs were lower than PPL's retail rates.

However, I will assume the evidence plaintiffs have provided shows the wholesale prices actually in effect during the relevant period and compare those to the retail prices plaintiffs have provided.  *See Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 984 (7th Cir. 1980) ("The trial court compared the rates, wholesale and retail, actually in effect under dual regulation at a particular time.").  However, plaintiffs still have not provided evidence from which a reasonable jury could find that a price squeeze existed.  "[A] price squeeze occurs when the integrated firm's price at the first level is too high, or its price at the second level is too low, for the independent to cover its costs and stay in business."  *Concord v. Boston Edison Co.*, 915 F.2d 17,18 (1st Cir. 1990) (discussing *United States v. Aluminum Co.*, 148 F.2d 416, 437-38 (2d Cir. 1945) (*Alcoa*)).  The limited evidence provided suggests that PPL's retail prices for 1 MWH of power allegedly ranged from $150.90 to $57.63, depending upon the use of the electrical power and the volume sold.  (Pl. Ex. 26.)  PPL's wholesale rates to the Boroughs were allegedly $43.20/MWH in 2002 and $45.70/MWH in 2003.  (Pl. Ex. 23.)  Under these circumstances, the court cannot determine whether a price squeeze existed without additional evidence:  if the Boroughs charged the same retail rates as PPL, there were potential profit ranges of $107.70-$14.43/MWH in 2002 and $105.20-$11.93/MWH in 2003.  Even the least amount that PPL charged any retail customer, as reflected in plaintiffs' exhibit twenty-six, was greater than the wholesale rates charged to the Boroughs in either 2002 or 2003.[18]  Thus, along with the wholesale and retail prices charged by

---

[18]Plaintiffs correctly argue that they do not need to show that PPL's retail prices were lower than the wholesale price paid by the Boroughs and their burden is to "establish . . . that PPL's price in the retail market is so low that competitors cannot make a 'living profit' if they to

PPL, plaintiffs must provide evidence of their costs of operation to determine whether their profit

would be too small or non-existent if they charged the same retail price as those of PPL.  Though

plaintiffs provide evidence that shows their retail prices were higher than PPL's, this is

insufficient to support a finding that their profit would be too small or non-existent selling energy

at the same price as PPL.  (*See* Pl. Ex. 26.)  By not providing any indication of how much it cost

plaintiffs to resell electricity, the plaintiffs have failed to provide specific facts demonstrating

there is a genuine issue for trial as to whether their profits would be too small or non-existent,

such that it would be "unable to compete" charging the same rates as PPL.  *Kirkwood*, 671 F.2d

at 1176; *see also Alcoa*, 148 F.2d at 437 (requiring a plaintiff to show it could not making a

"living profit" because of the price squeeze); FERC Price Squeeze Issue, 12 C.F.R. § 2.17

(requiring, *inter alia*, "[a] showing that the retail rates are lower than the proposed wholesale

rates for comparable service; . . . [and t]he wholesale customer's prospective rate for comparable

retail service, i.e. the rate necessary to recover bulk power costs (at the proposed wholesale rate)

and distribution costs"

  Plaintiffs cite several cases where courts have evaluated the existence of a price squeeze;

however, in each of those cases, the alleged retail prices of the defendant exceeded its wholesale

prices.  *See Kirkwood,* 671 F.2d at 1176 ("Because the wholesale rate Kirkwood paid to UE

following these rate increases exceeded the retail rate paid by UE's large industrial primary

service customers, Kirkwood asserts that it suffered competitive injury."); *Groton,* 662 F.2d at

925 (noting the plaintiffs' allegations that the defendant "placed the municipalities in a price

---

meet it."  (Pl. Sur-Reply 19 n.3.)  However, without any indication of the costs of providing
service the court is unable to assess whether plaintiffs could have made a "living profit."

squeeze by charging more for its sale of power to the plaintiffs at wholesale than it did for the sale of power at retail to its own industrial customers"); *Mishawaka*, 616 F.2d at 978 (affirming district court's finding that "[b]ecause the utility's wholesale rates charged the municipalities. . . exceeded the retail rates charged to its own retail customers, the utility was . . . guilty of a 'price squeeze'"); *Borough of Ellwood City,* 570 F. Supp. at 557 ("Boroughs allege that they pay more, as wholesale customers, than retail industrial customers pay for similar service."). Thus, in these cases, the plaintiffs would not have needed to provide evidence of the costs associated with their operation to show a price squeeze because it was impossible for them to charge the same retail price as the defendants and operate at a profit. Though the Boroughs allege that the wholesale rates PPL charged them were higher than the "fixed" retail rates, (Compl. ¶ 18), the facts do not support their claim. Taking as true the limited evidence of rates provided by plaintiffs, as discussed above, the retail rates charged by PPL were consistently higher than the wholesale rates charged to the Boroughs and potentially room existed for a profit; thus, plaintiffs must provide some evidence of their costs to show that they were in fact "squeezed."

As evidence of a price squeeze, plaintiffs provide the report of their expert Dr. John W. Wilson. (Pl. Ex. 3.) Dr. Wilson states that PPL offered "the [B]oroughs wholesale prices that are substantially higher than the retail prices that [PPL] charges for comparable service to industrial and commercial customers for whom [PPL] and the Boroughs compete[, which] creates a 'price squeeze' that impairs the Boroughs' ability to compete." (Pl. Ex. 3 ¶ 17.) However, Dr. Wilson does not cite a single piece of evidence that would support his conclusions. Moreover, Dr. Wilson's opinion has no basis in the record because the evidence provided shows that PPL offered the Boroughs wholesale prices that were, in fact, lower than the retail prices

PPL charged.  (*See* Pl. Exs. 23, 26.)  As the Third Circuit has previously held, "the factual predicate of an expert's opinion must find some support in the record."  *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.,* 745 F.2d 248, 262 (3d Cir. 1984) (citing with approval *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666 (D.C. Cir. 1977)).  The court in Merit made clear that to hold a court is precluded "from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than . . . theoretical speculations would seriously undermine the policies of Rule 56."  *Merit*, 569 F.2d at 673.

Plaintiffs also provide the affidavit of F. Lee Mangan, the Chairman of the Borough Group, in which he states that "PPL's increases to the Boroughs' power supply agreements for the fourth and fifth years directly impaired the Boroughs' ability to compete with PPL."  (Pl. Ex. 2 ¶ 12.)  However Mangan does not provide any evidence that he has personal knowledge of the relationship between the Boroughs' wholesale rates and PPL's retail rates, nor does he provide any price information to support his conclusions.

In conclusion, to establish a price squeeze plaintiffs needed to show that they were in fact "squeezed," i.e., that there was a too small or non-existent differential between the wholesale rates the Boroughs paid PPL and retail rates PPL charged to its commercial and industrial users for the Boroughs to be profitable.  Plaintiffs fail to provide evidence of the actual wholesale and retail rates charged in years four and five of the Power Supply Agreements, the years of the alleged price squeeze.  Even if the court viewed the wholesale and retail rates provided as the ones that were in fact charged, (which show a lower price at wholesale to the Boroughs than PPL's retail charge to its commercial and industrial users) there is no evidence of plaintiffs' operational costs, thus they have not provided evidence that if they charged the same retail rates

as PPL they would have been unable to compete profitably.  Thus plaintiffs have failed to put

forth specific facts showing that there is a genuine issue for trial with respect to the first element

of the prima facie case of a price squeeze.

## C.  Monopoly Power in the Relevant Market

To sustain a prima facie face for a price squeeze claim, plaintiffs must provide evidence

from which a trier of fact could find that PPL exercised monopoly power in the relevant market.

Analysis of the relevant market must encompass both the geographic[19] and product markets.

Where, as here, the plaintiffs have alleged that defendants raised wholesale rates rather than

lowered retail rates, plaintiffs must provide evidence that PPL had monopoly power in the

wholesale electricity market, i.e., the market in which the relationship of PPL and the Boroughs

was that of supplier and customer.  *See Phila. Elec. Co.,* 692 F.2d at 312 (holding that where a

defendant is alleged to have impaired a customer-competitor's ability to compete by raising

wholesale rates, the relevant product market is the wholesale market).[20]  To show that PPL

possessed monopoly power in the wholesale electricity market, the Boroughs must establish that

PPL had "the power to control prices or exclude competition" in that market.  *Grinnell,* 384 U.S.

---

[19]Plaintiffs simplistically assert that the "relevant geographic market consists of the areas in which PPL distributes at retail and the areas therein where the Boroughs distribute at retail within their respective municipal distribution systems."  (Pl. Mem. Opp'n Summ. J. 5.) However, this court need not analyze the validity of this designation since it has not been explicitly challenged by defendants and because plaintiffs fail to establish PPL's monopolization of the relevant product market.

[20]Plaintiffs' have provided evidence relevant to showing that PPL had monopoly power in the *retail* market in the relevant geographic area.  (*See, e.g.*, Pl. Mem. Opp'n Summ. J. 6-7.) This evidence is not relevant as the appropriate market for plaintiffs' price squeeze claim is not the retail market but the wholesale market for electricity.

at 571.  The Third Circuit has explained that "[a]lleging market share alone is not sufficient to

state a claim under the Sherman Act.  Monopolization or threatened monopolization requires

something more, which may include 'the strength of competition, probable development of the

industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of

consumer demand.'"  *Crossroads Cogeneration Corp. v. Orange & Rockland Utils*., 159 F.3d

129, 141 (3d Cir. 1998) (quoting *Barr Labs., Inc. v. Abbott Lab*, 978 F.2d 98, 112-13 (3d Cir.

1992)).  In order to make their evidentiary showing, plaintiffs rely on two pieces of evidence: a

report by the PUC and the affidavit of plaintiffs' expert, Whitfield Russell.

Plaintiffs rely heavily on an Investigation Report authored by the PUC as proof that PPL

monopolized the daily capacity market from January to March 2001 as evidence that this

behavior in turn "drove up prices in the entire wholesale market for electricity in Pennsylvania."

(Pl. Mem. Sur-Reply Summ. J. 10.)  A party opposing summary judgment must produce

evidence "as would be admissible at trial."  Fed. R. Civ. P. 56(e).   While the Supreme Court in

*Celotex v. Catrett* rejected the view that a non-moving party "must produce evidence in a form

that would be admissible at trial in order to avoid summary judgment," such evidence may only

be considered if it could later be reduced to an admissible form.  477 U.S. 317, 324, 327 (1986);

*see also*, *Blackburn v. UPS, Inc*., 179 F.3d 81, 95-103 (3d Cir. 1999) (concluding that hearsay

evidence that was not capable of being admitted at trial could not be considered on a motion for

summary judgment); *Philbin v. Trans Union Corp*., 101 F.3d 957, 961 n.1 (3d Cir. 1996) ("Thus,

the hearsay statement by this unknown individual is not capable of being admissible at trial and

could not be considered on a motion for summary judgment." (internal quotation and citations

omitted)).  Because the PUC Investigation Report does not fall within a hearsay exception, the

report is not reducible to a form that would be admissible at trial.

Plaintiffs argue that the PUC's Investigation Report is admissible under Federal Rule of Evidence 803(8)(C), which provides a hearsay exception in civil actions for reports of public agencies, setting forth "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The Supreme Court has concluded that Rule 803(8)(C) does not preclude the introduction of the conclusions in such reports so long as: (1) all statements in the report were based on a factual investigation and (2) any portion of the report that is admitted is sufficiently trustworthy. *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169 (1988). Four non-exhaustive factors to be considered in determining the trustworthiness of a report are: (1) the timeliness of the investigation, (2) the investigator's skill and experience, (3) whether a hearing was held, and (4) possible bias when reports are prepared with a view to possible litigation. *Id.* at 168 n.11. The finality of a report is also relevant to a public report's trustworthiness. *Stecyk v. Bell Helicopter Textron*, 1998 U.S. Dist. LEXIS 16772, *48 (E.D. Pa. Oct. 23, 1998); *In re Complaint of Munyan*, 143 F.R.D. 560, 564 (D.N.J. 1992) (citing *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1147 (E.D. Pa. 1980)). The party opposing the introduction of a public report bears the "burden of coming forward with enough negative factors to persuade a court that a report should not be admitted." *See In re Complaint of Nautilus Motor Tanker Co.*, 85 F.3d 105, 113 (3d Cir. 1996).

The Investigation Report was issued on June 13, 2002, approximately a year after the alleged monopolization in the daily capacity market. (Pl. Ex. 10 at 2, 65.) The PUC, the state commission regulating the retail sale of electrical power in Pennsylvania with specific

authorization to conduct investigations regarding the exercise of monopoly power, had the requisite skill and experience.  *See* 66 Pa. Cons. Stat. § 2811.  However, the PUC never held a hearing or examined any witnesses before writing the report.  (*See* Def. Ex. 1 at 4.)  The final outcome of the report was the PUC's referral of the matter to FERC, the Pennsylvania Attorney General, and the Department of Justice.  (Def. Ex. 10 at  4, 64.)  After issuance of the report, the PUC explicitly recognized that the Investigation Report was not "a conclusive or final determination on the merits" and as such, Pennsylvania law dictated that the report "will not be binding on or evidence for other governmental agencies or courts."  (Def. Ex. 1 ¶¶ 16, 19); *see also* 66 Pa. Cons. Stat. § 316.  Moreover, the PUC stated that it expected "that any other court or other body called upon to reach conclusions regarding [PPL's] conduct will do so only on the basis of a separate and independent appraisal of the facts and law, and in a manner that affords [PPL] appropriate due process."  (Def. Ex. 1 ¶ 20.)  Based upon the lack of a hearing, or other necessary due process, the stated intent of the PUC that the report not be considered as evidence, and the lack of any final determination by the PUC, the court concludes there are sufficient negative factors that the Investigation Report would not be admissible under Rule 803(8)(C).

In considering plaintiffs additional evidence—most notably Russell's expert report—instead of arguing that PPL engaged in monopolistic behavior in the wholesale market generally, plaintiffs claim that PPL exhibited monopoly power in the daily capacity market.[21]

---

[21]Wholesale electricity purchasers, who are members of PJM Interconnection ("PJM"), the relevant regional wholesale electricity market established by the FERC, can buy their necessary power by any one of three methods that are regulated by FERC and authorized by PJM: (a) acquiring energy through bilateral contracts with other entities; (b) purchasing in the PJM long-term auction market; or (c) purchasing in the PJM daily auction market.  These wholesale purchasers are also subject to certain obligations, including the "installed capacity" obligation, where PJM members are required to carry sufficient capacity resources to cover one day of

Plaintiffs assert that monopolization of the daily capacity market somehow increased the prices in the relevant wholesale electricity market, which, in turn, increased the bids they received from the suppliers that plaintiffs contacted when testing the market.  The wholesale electricity price quotes plaintiffs received from potential suppliers when testing the market in years four and five of the Power Supply Agreements were inclusive of "energy, capacity, transmission, and ancillary services."  (Pl. Ex. 23.)  However, plaintiffs do not demonstrate how the prices in the daily capacity market affected the overall price of capacity, given that capacity may also be purchased through contracts and the long term capacity markets.  (*See* Pl. Ex. 13 at 12.)  In fact, wholesale purchasers of energy satisfy ninety-five percent of their ICAP obligations through self-supply or bilateral contracts, with the remaining five percent satisfied by purchases in PJM's capacity markets—both daily and long term.  *PJM Interconnection, L.L.C.,* 95 F.E.R.C. ¶ 61,175, 61,563 (2001).  Thus, the extent to which behavior in the daily capacity market even affected the overall price for capacity, which, in turn, could affect overall wholesale energy prices charged by other potential suppliers to the Boroughs, is non-existent.

Plaintiffs also fail to show how alleged monopolization in the daily capacity market led to PPL having the power to control prices in the wholesale electricity market.  Plaintiffs allege that "to participate in the wholesale market, each [energy supplier] had to absorb the cost of obtaining both capacity (or capacity credits) and self-generating energy for eventual resale."  (Pl. Sur-Reply 11.)  Plaintiff's expert, Russell, states that "[a]lthough the rise in ICAP prices is not the only factor that increased power costs, the rise in ICAP prices does exert a noticeable contribution to

_____

energy sales they have contracted to provide to their retail customers.  *Utilimax.com*, 378 F.3d at 305.  Such "installed capacity" rights ("ICAP") may be purchased in a manner similar to energy transactions, but do not involve the right to any energy.  *Id.*

the increase in power prices." (Pl. Ex. 13 at 20.)  Russell's expert report states that "[t]he attached spreadsheet demonstrates the impact that PPL's price manipulation had upon power costs in PJM." (*Id.*)[22]  However, plaintiffs have failed to provide the spreadsheet as part of the record, thus there is no factual support given for Russell's conclusions.

Additionally, nowhere does Russell explain the relationship between the price of capacity in the daily capacity market and wholesale electricity prices.  In other words, he does not account for how the cost of capacity has the ability to influence the overall cost of wholesale energy.  He states that PPL's "manipulation has made power from competing alternative suppliers more costly and has contributed to the reduction in the number of competitors as well as a rise in the costs competitors must incur in order to compete." (*Id.* at 18.)  While presumably an increase in the cost of capacity would have an upward impact on the overall wholesale electricity price, which includes energy, capacity, transmission, and ancillary services, it is unknown whether the cost of capacity is, for example, 1% or 80% of the quoted wholesale energy price, which would have an impact on the extent of PPL's ability to influence the wholesale energy price via the alleged monopolization of the market for capacity.  Because only approximately five percent of capacity obligations were fulfilled through the daily auction market, if capacity costs represent only a small percentage of the wholesale price, it would be more difficult for the monopolization of this market to affect the  wholesale electricity market more generally.  Thus, plaintiffs fail to show how the price of daily capacity affected the wholesale prices plaintiffs were offered when they tested the wholesale market for alternative suppliers for years four and five of the Power

---

[22]I also note that, despite broad claims that could be said to apply to PPL's behavior more generally, the only Borough that Russell discusses is the Borough of Olyphant, which is not part of this claim.  *See supra* note 1.

Supply Agreements.  *See Grinnell,* 384 U.S. at 571 (stating that monopoly power is "the power to control prices or exclude competition").

Plaintiffs do not provide sufficient evidence for a reasonable jury to find that PPL exercised monopoly power in the wholesale electricity market, or even the daily capacity market, during the actual periods plaintiffs were testing the wholesale market.  Plaintiffs allege that PPL's monopolistic behavior occurred from January through March 2001, when the PUC investigation report identified an alleged price spike in the daily capacity market.  (Pl. Stmt. Facts ¶16.)  Plaintiffs first tested the wholesale market for lower cost power suppliers to avoid paying PPL the increases prescribed by the Power Supply Agreements on May 21, 2001, approximately two months later.  (Pl. Ex. 23.)  However, since the first quarter of 2001, changes made by the PJM in its ICAP capacity rules have prevented a reoccurrence of those elevated prices, specifically, once the "changes were implemented, the prices in the PJM daily capacity markets have fallen to near zero."  *The New Power Co. v. PJM Interconnection, Inc.*, 98 F.E.R.C. ¶ 61,208, 61,757 (2002).[23]  The Boroughs fail to provide any evidence showing how PPL's behavior two months earlier, in a separate market, affected the market price for "municipal wholesale electric supply contracts," given that daily capacity was trading at normal rates at the

_____

[23]Allegedly, from January 1, 2001 until roughly March 31, 2001, PPL was the dominant entity selling capacity in the PJM daily capacity market and was able to force the market price of capacity up to the established cap price.  (Pl. Stmt. Facts. ¶ 16.)  During this period, plaintiffs allege that PPL's actions resulted in the price for capacity never going below the cap, and on some days, deficient energy suppliers were forced to pay a penalty of twice the cap to the pool, which would then distribute the penalty payment to those systems having excess capacity.  (*Id.*)  For this statement of fact, plaintiffs rely almost entirely on the PUC Investigation Report, (*see id.* (citing Pl. Ex. 10)), which, as described above, is inadmissible hearsay.  However, even plaintiff's own report states that, as of April 1, 2001, daily capacity credits were trading within a normal range and PJM rules were changed as of June 1, 2001 to prevent a repeat of the market instability, (Pl. Ex. 10 at 12).

time the plaintiffs tested the market.[24]   (Pl. Ex. 23.)

Plaintiffs again shopped around for wholesale electricity for the fifth year of the contract on May 22, 2002, approximately fourteen months after PPL's alleged monopolistic behavior. (Pl. Ex. 5.)  Plaintiffs allege that PPL's conduct in the daily capacity market "caused significant withdrawal of competitors from the market" well into 2002.  (Pl. Sur-Reply Stmt. Facts ¶16.) However, there is no evidence that PPL's behavior in the daily capacity market in the winter of 2001 affected capacity or wholesale prices more than a year later in the spring of 2002.[25] Therefore, even if PPL did control prices in the daily capacity market, which then caused an increase in the price of wholesale electricity from January 1, 2001 until March 3l, 2001, PPL's monopoly power had ended by the time the plaintiffs shopped for new wholesale electricity suppliers on May 22, 2001 and May 20, 2002.

_____

[24]Plaintiffs allege that the lowest bidders responding to their inquiry for alternate power supplies in May 2001 and May 2002 had purchased capacity from PPL in the daily auction market during the first quarter of 2001, and thus the bidders' prices for energy subsequently increased.  (Pl. Statement of Facts ¶16.)  While this may be a logically sound proposition, plaintiffs do not, however, provide any evidence in the record to support this claim, specifically, which bidders those were and how their prices quoted to plaintiffs were detrimentally impacted by the earlier purchases in the daily capacity market.

[25]Plaintiffs cite the PUC Investigation Report to support their claim that the effects of PPL's behavior was still felt in "the wholesale market well into 2002."  (Pl. Sur-Reply Stmt. Facts ¶ 16 (citing Pl. Sur-Reply Stmt Facts (citing Pl. Ex. 10)).)  However, as discussed previously, this report is not admissible to combat the motion for summary judgment.  Plaintiffs also cite their exhibits five and twenty-three, which show only that PPL's prices for wholesale energy, even accounting for the five percent increases, were less than the bids of alternate energy suppliers.  (Pl. Sur-Reply Stmt. Facts ¶ 16; Pl. Exs. 5, 23.)  Plaintiffs also refer back to paragraph 16[B] of their original statement of facts, which in turn cites Russell's expert report.  (*See* Pl. Sur-Reply Stmt. Facts ¶ 16; Pl. Stmt. Facts ¶ 16.)  As discussed previously, Russell's report does not have foundational support for its conclusion that PPL's monopolization of the ICAP market increased prices for firm power to the extent that plaintiffs were prevented from finding alternative power suppliers.  (*See* Pl. Stmt. Facts ¶ 16 (citing Pl. Ex. 13).)

To summarize, the record fails to support a question of material fact as to whether PPL exerted monopoly power in the relevant market.  Plaintiffs' only evidence regarding monopolization deals with PPL's behavior in the PJM daily capacity market (and only for an earlier three month period) and not the relevant market for their price squeeze claim, the broader wholesale electricity market.  Even if PPL had monopolized the daily auction market for capacity, plaintiffs have failed to provide evidence showing how the wholesale electricity market (and therefore the wholesale prices plaintiffs were quoted when testing the market in May 2001 and 2002) was affected by the prices for capacity in the daily auction market during January to March 2001, such that PPL's behavior in the daily capacity market should be viewed as monopoly power in the wholesale market.

**D. Intent to Create a Price Squeeze**

To prove a price squeeze claim under Sherman Act § 2, plaintiffs must also "present evidence that the defendants deliberately produced the effect, sufficient to provide a reasonable basis for the jury to conclude that the 'squeeze' was not the result of natural market forces such as supply and demand or legitimate competition."  *Bonjorno,* 752 F.2d at 809.  The Seventh Circuit in *Mishawaka*, similarly held:

> In the particular circumstances . . . of a regulated utility struggling with dual regulation, bearing in mind that the utility is entitled to recover its cost of service and to provide its investors with a reasonable rate of return, we believe that something more than general intent should be required to establish a Sherman Act violation.

616 F.2d at 985.  In determining whether the plaintiff had produced sufficient evidence to find the defendant had "deliberately produced the effect," the court in *Bonjorno* determined:  "When a monopolist competes by denying a source of supply to his competitors, raises his competitor's

price for raw materials without affecting his own costs, lowers his price for the finished goods, and threatens his competitors with sustained competition if they do not accede to his anticompetitive designs, then his actions have crossed the shadowy barrier of the Sherman Act." *Bonjorno*, 752 F.2d at 811.  In *Mishawaka*, the court of appeals affirmed the trial court where it had "inferred utility intent to impair plaintiffs' competitive ability and the desire to preserve and expand its own existing monopoly," where the trial court had considered the evidence in its entirety, "including in general the continuing wholesale and retail rate disparity, threats to the municipal wholesale power supplies, and the utility policy of acquisition of municipal systems." 616 F.2d at 984-85.   Taking into account the admonition that "[i]ssues such as intent and credibility are rarely suitable for summary judgment," *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007), unlike *Bonjorno* and *Mishawaka*, where there were circumstances adduced from which intent to create a price squeeze could be inferred, I find that the Boroughs have failed to show there is a genuine issue of material fact as to whether PPL intended to create a price squeeze to eliminate the Boroughs as competitors in the retail market.

In support of this element, plaintiffs provide various pieces of evidence and assert several theories from which they contend PPL's predatory intent can be inferred.  I will attempt to address as thoroughly as possible all of these pieces of evidence and theories.  In their most recent supplemental briefing, plaintiffs assert that intent to produce the effect of a price squeeze can be inferred from the following: (1) PPL had a history of trying to eliminate the Boroughs as competitors; (2) the suggestive timing of PPL's anticompetitive conduct in the ICAP market, which coincided with the time period during which the plaintiffs had to test the market to find alternate suppliers; and (3) PPL's refusal to deal with the Boroughs after the expiration of their

contracts at the end of 2003.  Plaintiffs have additionally raised the issue of PPL's pricing

policies between its subsidiaries, which I will also address in this section.

As evidence that PPL sought to eliminate the Boroughs as competitors, plaintiffs provide

the following:  a letter sent by PPL to the industrial customers of Olyphant; the affidavit of the

Chairman of the Borough Group, F. Lee Mangan; and the report of plaintiffs' expert, Whitfield

Russell.  The letter at issue was sent by John Sipics PPL industrial customers in the Borough of

Olyphant Mid-Valley Industrial Park, on July 18, 2001.  (Pl. Ex. 16.)  Plaintiffs argue that the

letter, by informing potential retail customers that it would not renew the Boroughs' Power

Supply Agreements two and one-half years before they expired, PPL intended "to eliminate the

Boroughs as competitors."  (Pl. Sur-Reply Opp'n Summ. J. 17.)  First, the letter at issue was sent

only to PPL retail customers within the Borough of Olyphant.  (*See* Pl. Exh. 16.)  Thus, even if

the letter were evidence of PPL's specific intent, it could only potentially serve as evidence to

support Olyphant's claim (which is no longer at issue), not the other Boroughs.  Moreover,

Sipic's letter actually contains no statement that PPL would not renew its supply contract with

Olyphant.  (*Id.*)  The letter only informs Olyphant's customers that "[t]he generation supply

contract between the Borough and PPL ends January 31, 2004, leaving the Borough exposed to

competitive market prices, which the Borough may need to pass through to its customers."  (*Id.*)

This statement only indicates the end date of the current contract.  (*Id.*)  If PPL and the Boroughs

had renewed the contract, the two parties would have re-negotiated the wholesale electricity

rates, which would of course be affected by the energy prices in the wholesale market.  This letter

does not demonstrate that PPL deliberately produced a price squeeze in order to eliminate

competition from the Boroughs.  *See Concord*, 915 F.2d at 21 (stating that "a practice is not

26

'anticompetitive' simply because it harms competitors.  After all, almost all business activity, desirable and undesirable alike, seeks to advance a firm's fortunes at the expense of its competitors.  Rather, a practice is 'anticompetitive' only if it harms the competitive process").

Plaintiffs state that their expert, Russell, has "chronicle[d] the attempts by PPL to eliminate . . . the Borough of Olyphant, as a competitor."  (Pl. Supp'l Br. 11.)  Russell's report cites to internal PPL documents that state PPL's potential desire to purchase Olyphant's electric system.  (*See* Pl. Ex. 13 at 6.)  Plaintiffs then assert that "[w]hile PPL was focused on Olyphant because Olyphant was a threat to PPL's lucrative servicing of industrial customers within Olyphant's boundaries, PPL was also aware that the other plaintiff [B]oroughs were in a position to compete with PPL for retail customers."  (Pl. Supp'l Br. 12.)  Plaintiffs then cite the affidavit of F. Lee Mangan, the Chairman of the Borough Group, who states that the Boroughs "seek to protect their existing municipal systems within their boundaries by supplying power to these customers at rates that are competitive with PPL's rates in the relevant market."  (Pl. Ex. 2 ¶ 4.)  The fact that PPL may have desired to buy Olyphant's electric system[26] coupled with the fact that PPL and the Boroughs competed for retail customers, is insufficient for a jury to find that PPL intended to eliminate the Boroughs as competitors in the retail market for electricity.

Plaintiffs also appear to argue that the price squeeze itself is evidence of predatory intent, as they repeatedly allege that PPL purposefully increased wholesale rates so that the Boroughs were charged the same amount or more than the "frozen retail rates."  (*See, e.g.,* Pl. Supp'l Br. 12-13; Pl. Mem. Opp'n Summ. J. 11-12.)  In *Bonjorno*, the court found "some of the strongest

---

[26]I note that Olyphant is no longer a plaintiff with respect to this particular claim.  *See supra* note 1.

27

evidence that the price squeeze was deliberate" is the relationship between the price the defendant charged for the finished product (aluminum pipe) and the price it charged for the raw material (aluminum coil), where the price for the finished product the was actually less than for the raw material.  752 F.2d at 810.  It was clear that "either the [finished product] prices were too low, or the raw material prices too high," as the price for the finished product was often below the price of the raw material during the relevant period.  *Id.*  Unlike the plaintiffs in *Bonjorno*, the Boroughs have failed to demonstrate that a price squeeze in fact existed because their alleged prices for retail power were higher than their alleged prices for wholesale power and they failed to provide any evidence of their costs.  *See supra* Part III.B.  I also note that plaintiffs' own expert, Russell, acknowledged that even with the contractual price increases for 2002 and 2003, PPL's rates to the Boroughs under the Power Supply Agreements were "lower than the prevailing wholesale power costs."  (Pl. Ex. 23.)  Thus, the court can not infer deliberate anticompetitive pricing conduct from PPL's wholesale and retail prices.

Plaintiffs next assert that the timing of PPL's "efforts in both the ICAP market and the retail market is no coincidence," such that a reasonable jury could infer PPL's deliberate intent to create a price squeeze.  (Pl. Sur-Reply Opp'n Summ. J. 17.)  PPL's ability to manipulate its wholesale and retail prices was constrained by the requirements of the FERC-approved Power Supply Agreements and PUC-approved Joint Petition.  Plaintiffs ask the court to assume that PPL was able to predict in 1998, when it agreed to variable pricing in years four and five of the Power Supply Agreements, that the wholesale electricity markets in 2002 and 2003 would take a

significant upturn.[27]  (*See* Pl. Ex. 2.)  PPL agreed to the fixed POLR retail price range described

in the Joint Petition in August 1998, approximately two and one-half years before the alleged

anticompetitive behavior in the daily capacity market allegedly began.  (Pl. Ex. 15; Pl. Stmt.

Facts ¶ 16.)  PPL's retail prices were constrained by the prices set by the Competitive Default

Service ("CDS").[28]  At that time of the Joint Petition, PPL could not predict what retail price the

CDS would charge in 2002 and 2003 and thus, PPL could not predict precisely how low it could

set its retail prices.  (*See* Pl. Ex. 15 at 19 (stating that PPL's retail POLR prices from 2002 to

2009 could be "no less than the price charged by the CDS selected")).  Thus, it is not reasonable

to infer that PPL had the prescience to set up deliberately a pricing scheme that would result in a

price squeeze so far in advance, when both the wholesale and retail prices are based on variable

market prices and other factors outside of PPL's control.

Plaintiffs next assert that the timing of PPL's anticompetitive conduct in the ICAP market

prohibited plaintiffs' from finding alternative suppliers in the spring of 2001, which would have

enabled them to avoid the successive five percent increases pursuant to the Power Supply

Contracts, is suggestive of PPL's intent.  (*See* Pl. Supp'l Br. 12.)  Plaintiffs claim that PPL's

actions in the ICAP daily capacity market were the result of an internal policy, the goal of which

_____

[27]According to the Power Supply Agreements, the Boroughs had a reciprocal right to request a lower wholesale rate in years four and five of the contract.  (Pl. Ex. 2, Tab A, at 9-10.) Thus, if the prices in the wholesale electricity market had been lower than the contract price when plaintiffs tested the market, plaintiffs would have requested a five percent reduction of their wholesale rates and, if not granted, terminated the Agreements.  (*See* Pl. Ex. 2.)

[28]The Joint Petition specifically states that "20% of PPL's residential customers– determined by random selection . . .–shall be assigned to a [POLR] default supplier other than PP&L that will be selected on the basis of a Commission-approved energy and capacity market price bidding process," known as the CDS.  (Pl. Ex. 15 at 16.)

was to "drive up the costs of wholesale firm power available to other power suppliers, which forced higher wholesale rates on the Boroughs." (Pl. Mem. Opp'n Summ. J. 12.) As evidence of this internal policy plaintiffs offer report of their expert Dr. John Wilson. (*See* Pl Ex. 3.) However, as discussed previously, Dr. Wilson does not cite any evidence that would support his conclusions that PPL engaged in a price squeeze. *See supra,* Part III.B. Nor does Dr. Wilson refer to an internal PPL policy behind the alleged price squeeze. (*See* Pl. Ex. 3.) Moreover, even assuming plaintiffs have provided evidence that PPL took anticompetitive actions in the ICAP market, as described previously, plaintiffs have failed to provide evidence demonstrating the connection between the PJM ICAP market and the overall wholesale price for electricity. *See supra* Part III.C. Without information as to how monopolization of the PJM ICAP market would in turn increase the price of wholesale power, it is not possible for a jury to discern how plaintiffs intended to produce a price squeeze by such behavior.

Plaintiffs also contend that PPL's internal transfer pricing system is evidence of a price squeeze. Plaintiffs offer a report showing that PPL's internal transfer price for wholesale electricity was $35/MWH,[29] which is less than the price the Boroughs paid for wholesale power, as evidence of their intentional conduct. (Pl. Statement of Facts, ¶ 12; *compare* Pl. Ex. 6, *with* Pl. Ex. 23.) The Third Circuit has found that a transfer price system[30] "itself is not evidence of

---

[29]Though defendants argue, and I agree, that the report does not show the price at which PPL sold power to a PPL subsidiary, PPL EU, *see supra* note 7, for these purposes I will accept plaintiffs' interpretation.

[30]A transfer price is the internal price that a corporate parent company charges a subsidiary for some raw material, that usually "reflects the projected direct costs of producing the [raw material] and excludes an allowance for corporate overhead." *Bonjorno*, 752 F.2d at 810. "As such, the transfer price is usually well below the market price." *Id.*

classic predatory behavior"; however, when a defendant "could set whatever market price it chose for the raw material, within certain limits, without directly affecting its market price for [the finished product]," the use of this system may be evidence that the price squeeze was deliberate. *Bonjorno*, 752 F.2d at 810. However, the regulated electricity market in the present case is quite unlike the unregulated market for aluminum pipe at issue in *Bonjorno*. In *Bonjorno*, plaintiffs provided evidence that defendant controlled the price of the finished product and was the "price leader" in the market for the raw materials. *Id.* at 809-10. However, in the regulated electricity market, the price at which PPL sold wholesale power to the Boroughs was constrained by the Power Supply Agreements, which were approved by FERC. (*See* Pl. Ex. 2.) Additionally, PPL could not set whatever retail price it wanted for POLR power. From 2002 until 2009, PPL must set its retail price higher than the "price charged by the CDS," pursuant to the PUC-approved Joint Petition. (Pl. Ex. 15 at 19, Def. Ex. 11.) Thus, the dynamics of a traditional market on which the Third Circuit based its opinion in *Bonjorno*, where "the market price of the raw materials determines the price of the finished product," do not hold true for a regulated industry. 752 F.2d at 810.

Finally, plaintiffs claim that PPL's refusal to enter into a new wholesale power supply contract, after the Power Supply Agreements expired in 2003, is evidence of their predatory intent. (Pl. Supp'l Br. 13-14; Pl. Mem. Opp'n Summ. J. 12-13.) Plaintiffs provide a letter sent by John Sipics on July 18, 2001, then a vice president of PPL, as evidence that PPL knew that it "would not renew its power supply contract with the Boroughs." (Pl. Mem. Opp'n Summ. J. 12 *see also* Pl. Stmt. Facts ¶ 20.) Plaintiffs also submit evidence showing that PPL terminated its Power Supply Agreements with the Boroughs as of January 31, 2004 and that PPL chose not to

submit a bid for a new wholesale power agreement with the Boroughs.  (Pl. Ex. 17; Pl. Statement

of Facts ¶ 20.)  The Boroughs claim that this refusal to deal is evidence of PPL's intent to create

or maintain a monopoly.  (*See* Pl. Supp'l Br. 14; Pl. Mem. Opp'n Summ. J. (citing *Apartment*

*Source L.P. v. Phila. Newspapers, Inc.*, 1999 U.S. Dist. LEXIS 4337 (E.D. Pa. Apr. 2, 1999)).

PPL does not deny that it refused to do further business with the Boroughs, but PPL claims that it

did not do so with the intent to monopolize.  (Def. Stmt. Facts ¶ 20.)

 Though "a plaintiff can rely on a theory of predatory intent as a basis of recovery *in a*

*refusal to deal case*," the Boroughs do not raise a refusal to deal claim in their amended

complaint.  *Apartment Source L.P.,* 1999 U.S. Dist. LEXIS 4337 at *32 (emphasis added).  PPL

maintains it had a legitimate business reason for PPL not to renew the Power Supply Agreements

as the contentious litigation between the Boroughs and PPL was already ongoing at the time PPL

decided not to renew the contract on July 21, 2003.  *See United States v. Colgate & Co.*, 250 U.S.

300, 307 (1919) ("'A retail dealer has the unquestioned right to stop dealing with a wholesaler

for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly

in trying to undermine his trade.'" (quoting E. States Retail Lumber Dealers' Assoc. v. United

States, 234 U.S. 600, 614)); *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 890 (9th Cir.

1982) (affirming summary judgment for defendants on an antitrust claim where the defendant's

"purpose of avoiding future litigation whose costs exceeded the benefits from doing business

with [the plaintiffs] qualified as a legitimate business reason for refusing to deal").  Additionally,

the evidence shows that plaintiffs received numerous bids from power suppliers other than PPL

when looking for new wholesale power supply contracts that would commence on February 1,

2004 and February 1, 2005.  (Def. Exs. 9, 10.)  Given that other power suppliers were available

to replace PPL, it is not reasonable to infer that PPL's decision to not enter further business dealing with the Borough was necessarily done with a "purpose to create or maintain a monopoly." *Colgate*, 250 U.S. at 307.

In conclusion, plaintiffs failed to provide sufficient evidence from which a jury could find that PPL had the specific intent to serve its monopolistic purposes at the Boroughs' expense by creating a price squeeze.  The Boroughs' price squeeze claim is their only allegation of intentional conduct, which, standing alone, is not sufficient evidence of intent.  *See Concord,* 915 F.2d at 28.  From the evidence in the record, no reasonable juror could find that the alleged price squeeze resulted from deliberately anticompetitive, as opposed to legitimate, conduct.

## IV. Conclusion

Although upon reconsideration I determined that plaintiffs' price squeeze claim is not barred by the filed rate doctrine, I will still grant defendants' motion for summary judgment because plaintiffs have failed to demonstrate the existence of genuine issue of material fact with respect to any of the three required elements of a price squeeze claim:  (1) the existence of a price squeeze; (2) PPL had monopoly power at the wholesale level; and (3) PPL intended to create a price squeeze to eliminate the Borough as a competitor at the retail level.[31]  An appropriate order follows.

---

[31]Because plaintiffs have failed to meet their evidentiary burden with respect to any of the prima facie elements of a price squeeze, I need not address PPL's additional argument that the Boroughs have failed to show injury or damages.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BOROUGH OF LANSDALE,      :
BOROUGH OF BLAKELY      : CIVIL ACTION
BOROUGH OF CATAWISSA,     : NO. 02-08012
BOROUGH OF DUNCANNON,     :
BOROUGH OF HATFIELD,      :
BOROUGH OF KUTZTOWN,      :
BOROUGH OF LEHIGHTON,      :
BOROUGH OF MIFFLINBURG,     :
BOROUGH OF OLYPHANT,      :
BOROUGH OF QUAKERTOWN,     :
BOROUGH OF SCHUYLKILL HAVEN,
BOROUGH OF ST. CLAIR,
BOROUGH OF WATSONTOWN,
BOROUGH OF WEATHERLY,
PENNSYLVANIA
Plaintiffs,

v.

PP&L, INC., PPL ELECTRIC UTILITIES CORP., PPL
ENERGY PLUS, L.L.C., and PPL GENERATION,
L.L.C.,
 Defendants.

# ORDER

AND NOW, this _____ day of September, 2007, upon consideration of defendants'

motion for summary judgment as to plaintiffs' price squeeze claim in violation of the Sherman

Act § 2, plaintiff's responses and statement of facts, defendants' replies and statement of facts, as

well as the parties' supplemental briefing, IT IS HEREBY ORDERED that defendants' motion

for summary judgment as to the price squeeze claim in violation of the Sherman Act § 2 is

GRANTED and judgment is entered in favor of all defendants and against all plaintiffs on this

claim.  IT IS FURTHER ORDERED that counsel shall advise the court by letter within fourteen

(14) days of the date of this order as to their suggestions as to a trial date and anticipated length

of trial on the remaining claims.


_____s/ William H. Yohn Jr._____
William H. Yohn Jr., Judge
